[Cite as *State v. Hardy*, 2017-Ohio-7635.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO.   27158 |
| | : | |
| v. | : | T.C. NO. 15-CR-1185 |
| | : | |
| KIMIKO HARDY | : | (Criminal Appeal from |
| | : |   Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the _____15th_____ day of _____September_____, 2017.

. . . . . . . . . .

HEATHER N. JANS, Atty. Reg. No. 0084470, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

MARSHALL G. LACHMAN, Atty. Reg. No. 0076791, 75 N. Pioneer Blvd., Springboro, Ohio 45066
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Defendant-appellant Kimiko Hardy appeals her conviction and sentence for two counts of involuntary manslaughter (misdemeanor/violation of Dayton City Ordinance 91.50(A)/91.99 & R.C. 955.22(C)(2)/R.C. 955.99(E)(1)), in violation of R.C. 2903.04(B), both felonies of the third degree (Counts I and II); one count of failure to confine a vicious

dog (dog kills person), in violation of R.C. 955.22(C)(2) and R.C. 955.99(H)(1)(a), a felony of the fourth degree (Count III); one count of involuntary manslaughter (felony), in violation of R.C. 2903.04(A), a felony of the first degree (Count IV); one count of endangering children (parent-serious harm), in violation of R.C. 2919.22(A), a felony of the third degree (Count V); and one count of involuntary manslaughter (felony child endangering), in violation of R.C. 2903.04(A), a felony of the first degree (Count VI).   Upon election by the State, the trial court merged Counts I through V with Count VI, involuntary manslaughter (felony child endangering), in violation of R.C. 2903.04(A), and sentenced Kimiko to three years in prison.   Hardy filed a timely notice of appeal with this Court on June 24, 2016.

{¶ 2} The incident which forms the basis for the instant appeal occurred on July 20, 2014, when Kimiko was babysitting her seven-month old grandson, J.Q., at the residence that she shared with her husband, Kano Hardy.   J.Q.'s mother, Kashyra Hardy, had dropped the baby off the previous day, July 19, 2014, so that she could attend a fashion show in Dayton, Ohio.   It was the first time that J.Q. had spent the night at his grandparents' house.   Kano is Kashyra's biological father, and Kimiko is her stepmother. Kashyra was born and raised in Dayton but was living in Indianapolis, Indiana, at the time this incident occurred.

{¶ 3} On the morning of July 20, 2014, Kano left the residence early in order to attend a motorcycle training class.   Kimiko was left alone to watch J.Q.   Also in the residence was the Hardys' dog, Busa, a four-year old Staffordshire terrier mix weighing approximately seventy-five pounds.   Staffordshire terriers are more commonly known as "pit bulls."   Kimiko was listed as the owner of Busa, and the dog was licensed under Kimiko's name.

{¶ 4} Normally, Busa was kept in a cage in the basement when people came over to the Hardys' residence. In fact, Kashyra testified that when she used to visit the Hardy residence before J.Q. was born, Busa was kept locked in a cage in another room and was never let out while she was there. Kashyra further testified that when her sister brought her own baby to the residence, Busa was kept in his cage and never permitted to be around the baby. The Hardys also put baby gates in the doorways in the interior of the house to keep Busa confined to a specific area of the house and out of certain rooms.

{¶ 5} After Kano left for his training class, Kimiko was watching J.Q. while he sat in his car seat. At some point, Kimiko got up and walked down the hallway to use the restroom, leaving J.Q. alone in the living room. Almost immediately after she had left the living room, Kimiko heard Busa jump over the baby gate and enter the living room. Kimiko ran back to the living room to grab J.Q. and keep Busa away from him. Kimiko testified that as soon as she picked up J.Q., Busa attacked the child and began biting him on his head. Kimiko got down on the floor to protect J.Q. and was bitten by Busa herself several times. Eventually, Kimiko was able to get up and run out of the house with J.Q. Kimiko took J.Q. to her neighbor's house, and the neighbor called 911. However, J.Q. had already succumbed to the wounds inflicted by Busa during the attack. Specifically, J.Q. died of blunt force trauma as a result of Busa biting through his scalp and skull.

{¶ 6} Police and other emergency personnel were dispatched to Kimiko's neighbor's residence located on Riverside Drive in Dayton, Ohio, at approximately 12:18 p.m. Upon arriving at the scene, police made contact with Kimiko who was sitting on her neighbor's porch holding J.Q.'s body. Kimiko was "sobbing hysterically," wearing a robe

stained in blood. After speaking to police for a short time, Kimiko signed a consent to search form permitting them to enter her house and investigate the incident. Since Busa was still located in the Hardy residence, the police contacted the Montgomery County Animal Resource Center (ARC). An employee from the ARC arrived in a vehicle specially designed to contain aggressive animals. The ARC employee, Christopher Byrd, entered Kimiko's residence, removed Busa, placed the dog in the back of his vehicle, and took him to the ARC. We note that after being held at the ARC for a short period of observation, Busa was euthanized on September 9, 2014.

{¶ 7} Later on July 20, 2014, Kimiko was taken to the Safety Building in downtown Dayton and questioned by police. Before being questioned, Kimiko was provided with her *Miranda* warnings. Kimiko signed the pre-interview waiver of rights form and agreed to speak with the police. On July 21, 2014, Detectives William Geiger and Nathan Via returned to Kimiko's residence and asked her to sign another consent to search form. After Kimiko signed the form, the detectives searched the residence a second time. Once the search was completed, Det. Via asked Kimiko to come to the Safety Building a second time for further questioning. Kimiko returned to police headquarters with the detectives. Before questioning began, the detectives reviewed Kimiko's *Miranda* rights with her, and she waived said rights. After speaking with the detectives for approximately one hour, Kimiko invoked her right to counsel. Questioning immediately ceased, and Kimiko left the Safety Building with a relative.

{¶ 8} On July 22, 2015, Kimiko was charged by indictment with two counts of involuntary manslaughter (misdemeanor); one count of failure to confine a vicious dog (dog kills person); one count of involuntary manslaughter (felony); one count of

endangering children (parent-serious harm); and one count of involuntary manslaughter (felony child endangering). At her arraignment on August 6, 2015, Kimiko stood mute, and the trial court entered a plea of not guilty on her behalf.

{¶ 9} On August 27, 2015, Kimiko filed a motion to suppress in which she sought suppression of any statements she made to police when she was interviewed at the Safety Building on July 20, 2014, and July 21, 2014. A hearing was held on said motion on October 29, 2015, and November 20, 2015. On January 8, 2016, the trial court issued a decision overruling Kimiko's motion to suppress, finding that Kimiko was properly advised of her *Miranda* rights and that she made a knowing, intelligent, and voluntary waiver of her constitutional rights before speaking with the police.

{¶ 10} On April 15, 2016, Kimiko filed a motion in limine in order to preclude the State from using evidence of a prior arrest for failure to control her dog pursuant to Evid. R. 404(B) and from being able to refer to Busa at trial as a "dangerous" or "vicious" dog. The trial court issued an order granting Kimiko's motion regarding her prior arrest and evidence of a new neighbor statement, but denied her motion in limine as it related to the use of the words "dangerous" or "vicious" in order to describe Busa.

{¶ 11} On April 15, 2016, Kimiko filed a motion to dismiss Counts III and IV in the indictment because Busa was never classified as a "vicious" dog under Ohio law prior to the mauling of J.Q. The trial court overruled Kimiko's motion to dismiss in an order issued on April 22, 2016.

{¶ 12} On April 26, 2016, Kimiko filed a second motion to dismiss Counts I, II, IV, V, and VI in the indictment. Kimiko alleged that she could only be charged in Count III because the applicable specific statutory provision implicated in this count prevails over

the other conflicting general statutes in the remaining counts. The trial court orally overruled Kimiko's second motion to dismiss just prior to trial on May 2, 2016.

{¶ 13} A week-long jury trial was held on May 2 through May 6, 2016. In addition to evidence regarding Busa's fatal attack on J.Q., evidence was also adduced with respect to two prior incidents involving Busa that occurred before July of 2014. Specifically, evidence was submitted that on April 26, 2014, Busa ran out from the side of the Hardys' residence and started barking and acting very aggressive towards the mail carrier, Donnie Freels. During the encounter, Busa lunged at Freels, but he used his mail bag to shield himself from the dog. Freels further testified that Busa bit his mail bag, and he was able to run away. After the attack, Freels called his supervisor who, in turn, called the ARC. As a result of Busa's attack on Freels, Kimiko was required to attend an animal awareness class at the Animal Resource Center. Freels testified that he refused to deliver mail to the Hardy residence after Busa attacked him, and they were required to get a P.O. Box in order to receive their mail. Officer Beverly White from the ARC visited Kimiko and advised her to have Busa neutered in order to curb his negative behavior. Based on Busa's aggressive behavior towards Freels, Officer White further suggested that she have the dog euthanized.

{¶ 14} The second incident occurred on June 3, 2014, when Isabelle Crickmore was walking her dog, a beagle mix, on the sidewalk in front of the Hardy residence. Busa ran down through the yard and attacked Crickmore's dog. The attack resulted in three lacerations and eleven staples to the beagle's right rear leg. After the attack, Busa ran back into the house, and Crickmore called the police. Crickmore testified that Kimiko eventually came outside, and the two women exchanged information. Ultimately,

Crickmore filed a complaint against Kimiko with the City of Dayton.

{¶ 15} As a result of the second attack, Officer Kandi Broadus from the ARC visited Kimiko the same day. Officer Broadus advised Kimiko that she could be liable for the injuries to Crickmore's dog. Officer Broadus also asked Kimiko if she wanted to surrender ownership of Busa to the ARC in order to avoid any further incidents. Kimiko declined.

{¶ 16} A little over a month later on July 20, 2014, Busa fatally mauled J.Q. in the Hardy residence. Kashyra testified that at the time of J.Q.'s death, she was unaware of the separate incidents involving Busa attacking Freels as well as Crickmore's dog. Kashyra further testified that had she been aware of the two attacks, it would have affected how safe that she thought her child was around Busa.

{¶ 17} At the conclusion of the trial, Kimiko was found guilty of all of the counts in the indictment. Upon election by the State, the trial court merged Counts I through V with Count VI, involuntary manslaughter (felony child endangering), and sentenced Kimiko to three years in prison.

{¶ 18} It is from this judgment that Kimiko now appeals.

{¶ 19} Kimiko's first assignment of error is as follows:

{¶ 20} "THE TRIAL COURT ERRED BY OVERRULING MS. HARDY'S MOTION TO SUPPRESS STATEMENTS THAT WERE OBTAINED IN VIOLATION OF HER CONSTITUTIONAL RIGHTS."

{¶ 21} In her first assignment, Kimiko contends that the trial court erred when it overruled her motion to suppress the statements she made when she was interviewed by police detectives at the Safety Building on July 20, 2014, and July 21, 2014. Specifically,

Kimiko argues that although she was advised of her *Miranda* rights prior to the beginning of both interviews, she did not make a knowing, intelligent, and voluntary waiver of her rights because of deceptive comments made by the detectives.

{¶ 22} In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford,* 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994); *State v. Knisley,* 2d Dist. Montgomery No. 22897, 2010-Ohio-116, ¶ 30. Accordingly, when we review suppression decisions, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Retherford* at 592, 639 N.E.2d 498. "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

{¶ 23} "Under the Fifth Amendment to the United States Constitution, no person shall be compelled to be a witness against himself. In order to ensure that this right is protected, statements resulting from custodial interrogations are admissible only after a showing that the procedural safeguards described in *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), have been followed." *State v. Western,* 2015-Ohio-627, 29 N.E.3d 245, ¶ 12 (2d Dist.). "[T]he State has the burden to show by a preponderance of the evidence that a defendant's confession was voluntarily given." *Id.* at ¶ 16.

{¶ 24} "Whether a statement was made voluntarily and whether an individual knowingly, voluntarily, and intelligently waived his or her *Miranda* rights are distinct issues." *State v. Lovato,* 2d Dist. Montgomery No. 25683, 2014-Ohio-2311, ¶ 30.

Generally, statements made to police after a knowing, intelligent, and voluntary waiver of an individual's *Miranda* rights are presumed voluntary. *Id.* at ¶ 31. However, "[t]he *Miranda* presumption applies to the conditions inherent in custodial interrogation that compel the suspect to confess. It does not extend to any actual coercion police might engage in, and the Due Process Clause continues to require an inquiry separate from custody considerations and compliance with *Miranda* regarding whether a suspect's will was overborne by the circumstances surrounding his confession." *State v. Porter,* 178 Ohio App.3d 304, 2008-Ohio-4627, 897 N.E.2d 1149, ¶ 14 (2d Dist.). Therefore, "[r]egardless of whether *Miranda* warnings were required and given, a defendant's statement may have been given involuntarily and thus be subject to exclusion." *State v. Kelly,* 2d Dist. Greene No. 2004–CA–20, 2005-Ohio-305, ¶ 11.

{¶ 25} When making a determination regarding whether a valid waiver has occurred, we must "consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards,* 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus, *overruled on other grounds*, 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978).

{¶ 26} For instance, " '[p]romises of leniency by the police * * * are improper and render an ensuing confession involuntary.' " *State v. Holtvogt,* 2d Dist. Montgomery No. 24748, 2012-Ohio-2233, ¶ 13, quoting *State v. Hopfer,* 112 Ohio App.3d 521, 547, 679 N.E.2d 321 (2d Dist.1996). Moreover, if "an incriminating statement is forced from the mind of the suspect by the flattery of hope or by the torture of fear, [it] must be suppressed

because it was involuntary." *Porter* at ¶ 34.

**{¶ 27}** " 'The line to be drawn between permissible police conduct and conduct deemed to induce or tend to induce an involuntary statement does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police. * * *'" (Citations omitted). *State v. Jackson*, 2d Dist. Greene No. 02CA0001, 2002-Ohio-4680, ¶ 28.

**{¶ 28}** " 'When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, we can perceive nothing improper in such police activity. On the other hand, if in addition to the foregoing benefit, or in the place thereof, the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible. The offer or promise of such benefit need not be expressed, but may be implied from equivocal language not otherwise made clear.' " (Citations omitted.) *Id.* at ¶ 29.

**{¶ 29}** Finally, we determined in *Jackson* " 'that false promises made by police to a criminal suspect that he can obtain lenient treatment in exchange for waiving his Fifth Amendment privilege so undermines the suspect's capacity for self-determination that his election to waive the right and incriminate himself in criminal conduct is fatally impaired. His resulting waiver and statement are thus involuntary for Fifth Amendment purposes. * * * The simple result is that officers must avoid such promises, which are not proper tools of investigation.' " (Citations omitted). *Id.* at ¶ 40.

**First Interview – July 20, 2014**

**{¶ 30}** The record establishes that Kimiko's first interview began at approximately 2:55 p.m. on July 20, 2014, and was conducted by Detectives Nathan Via and David House. The interview took place at the Safety Building in Dayton, Ohio. Det. House placed Kimiko in a room where the interview could be recorded. Kimiko was not handcuffed, nor was she denied access to food, water, or use of a restroom. The interview lasted approximately forty-five minutes. Further, at the time of the first interview, Kimiko was thirty-six years old and had completed eleven years of schooling.

**{¶ 31}** At the beginning of the interview, Det. House informed Kimiko that she was not under arrest but that she would be read her *Miranda* rights. Det. House then proceeded to review the pre-interview waiver of rights form with Kimiko, after which she agreed to speak with the detectives without an attorney present. Det. House testified that although Kimiko seemed withdrawn and reserved, she was not "overly emotional" and had no trouble answering the questions that were asked of her. While there were times during the interview when Kimiko cried, Det. House testified that she never got so emotional that she was unable to continue. At no point during the interview did Kimiko indicate that she wanted to stop answering questions. Moreover, Det. House testified that Kimiko did not appear to be under the influence of drugs or alcohol. At the end of the interview, Kimiko was not arrested; rather, she was allowed to leave and obtained her own transportation to go home.

**{¶ 32}** Kimiko asserts that during the first interview, Det. House made a statement in which he essentially promised her that she would not be charged if she cooperated with the police and answered their questions. Kimiko argues the statement made by Det. House "coerced [her] into an involuntary confession" by "taking advantage of her

overwrought emotional state following such a traumatic experience with *** promises of leniency by the police." The following recorded exchange occurred between Kimiko and Det. House during the first interview:

Det. House: Now, you know, just to be real with you – okay – to let you know what's going on – what's going to happen is we have to investigate this.

Um, as I said, right now you're not under arrest, you know. *I have no idea if any type of charges would come from this. Um, I don't anticipate that but that's not my decision – okay – only because we – we take all the information that we have.*

*Um, we present the case to the prosecutor's office. If they feel that there's some reason, you know, that charges can be brought forward, they will –*

Kimiko: (Indiscernible) charge me because them other two incidents –

Det. House: Well, those other case have to be looked at, you know. It's – I'm stating here right now I can't say that that's – that's going to be what happens. You know, I can't say one way or the other, you know, but just to let you know that's what has to be looked at. Okay? And, you know, as soon as we find out one way or the other, you will – we'll obviously let you know what's going on. ***

**{¶ 33}** In our view, the statements made by Det. House during the first interview do not amount to coercion. Det. House never tried to scare Kimiko, never threatened

her, and never promised leniency. More importantly, Det. House never told Kimiko that she would not be charged with a crime. In fact, Det. House stated that his task was to investigate the death of J.Q. and present his findings to the prosecutor. Det. House advised Kimiko that it was the prosecutor's decision whether to pursue a criminal case against her. Accordingly, the totality of the circumstances establishes that the questioning of Kimiko during the first interview was not unlawfully coercive, and she knowingly, intelligently, and voluntarily waived her constitutional rights.

### Second Interview – July 21, 2014

{¶ 34} On July 21, 2014, Kimiko voluntarily agreed to be interviewed a second time by police. After being transported to the Safety Building by a relative, Kimiko was escorted to an interview room by Det. Via. Similar to the first interview, the second interview was also recorded. Kimiko was not placed in handcuffs, nor was she denied access to food, water, or use of a restroom. The second interview lasted approximately one hour. Kimiko was interviewed by Det. Via and Det. Thomas Cope.

{¶ 35} Again, Kimiko was informed that she was not under arrest but that she would be read her *Miranda* rights. Det. Via then proceeded to review the pre-interview waiver of rights form with Kimiko, after which she agreed to speak with the detectives without an attorney present. Det. Via specifically asked Kimiko if she felt that she was being coerced into answering questions, and she stated that she did not feel that way. Kimiko reiterated that she had completed eleven years of school. Det. Via testified that Kimiko did not appear to be under the influence of drugs or alcohol. Additionally, no evidence was presented which established that Kimiko was "emotionally overwrought" or otherwise incapable of answering the detectives' questions. At the end of the interview,

Kimiko stated that she wanted to speak with an attorney. Det. Via testified that at that point, all questioning ceased. Kimiko was not arrested; rather, she was allowed to leave and obtained her own transportation to go home.

**{¶ 36}** Kimiko argues that during the second recorded interview, Det. Cope misstated the law, and his misstatement amounted to coercion thereby rendering her statements inadmissible. During the second interview, the following exchange occurred:

Det. Cope: I would just say a dog mauling. (Indiscernible). He's going to put "dog mauling" here. We're not sure that what we're dealing with is a crime or isn't a crime and, if it is a crime, what crime it would be kind of thing. It's kind of uncharted territory but we do know that the dog mauled the kid to death so that's what we're going to put on there – just so you know. That's (indiscernible). Just so that you're not confused in any way. Okay?

Kimiko: Okay.

**{¶ 37}** The record establishes that Det. Cope made the above statement in reference to the subject of the interview which he wrote down at the top of the pre-interview waiver of rights form. We cannot find that Det. Cope was lying to Kimiko, nor did he misstate the applicable law when he decided upon "dog mauling" as the heading on the pre-interview form. This characterization of the events is not coercive and does not amount to any kind of promise or threat to induce Kimiko to speak to the detectives.

**{¶ 38}** Kimiko also argues that Det. Cope made statements during the second interview claiming that Busa was more aggressive because it had not been neutered and that the ARC awareness class that she had attended prior to the incident taught her that

pit bulls were vicious animals. Kimiko contends that these statements amount to coercive behavior. The following exchange occurred in pertinent part:

Det. Cope: Why – why would you keep – why would you not fix him? Did you intend on breeding him or –

Kimiko: Yeah, we intended on breeding him.

Q: Okay. And now have you heard – you know the fact that when you don't neuter a dog, the testosterone is still flowing – did you know about that?

A: (Indiscernible) out.

Q: Okay. When did –

A: I went to the, um, classes.

Q: Okay. You said in your classes? When did go to classes?

A: Um, the mailman incident.

Q: Okay. Was that because [sic] a result of the mailman incident?

A: Uh-huh.

Q: Okay. Where were these classes held?

A: At the, um, Animal Resource Center.

***

Q: *** Okay. And what did you learn from these classes?

A: They took a lot of pictures of what dogs can do, all the common vicious dogs. Um, they mentioned about spay and neutering [sic]. They mentioned about how important a license is – dog license – and, um, they talked about so much. There was information [sic] different clinics and

places we could go and get him spayed – you know, the animal spayed or neutered.

Q: Okay. And they showed you – basically they showed you all the, like, low cost options you had for doing that and they explained to you that, by not spaying or neutering your dog, you're making it more aggressive? Was that part of the program?

A: Yeah.

Q: Okay. So that happens. You get that information, right? And that's given – and that's in response to him attacking the mailman. Okay?

A month later or less than – probably less than a month after that – because you had the incident and then you had the class and then he bit this dog walking down the street. Right?

A: Yes.

Q: Oaky. And you still didn't get him fixed? You had to think, "Oh man. This is becoming a liability to me. I really need to do something about this." I mean, I guess I don't understand what the purpose was of not getting him fixed at that point.

A: *At that point, we still trying to breed him* [sic].

**{¶ 39}** Upon review, we agree with the trial court that Det. Cope's statements were not misleading or coercive. Det. Cope wanted to know why Kimiko failed to have Busa neutered after the two prior attacks and despite the class where she learned about the benefits of spaying or neutering an aggressive dog. Kimiko's explanation for failing to neuter Busa was that she wanted to breed him. Kimiko was aware, because of what she

learned in the animal awareness class and what she had been told by ARC officers, that neutering Busa would make him less aggressive.

{¶ 40} The totality of the circumstances here establishes that the questioning of Kimiko was not unlawfully coercive. The second recorded interview reveals no time when Kimiko's free will was overborne. Kimiko's entire conversation with the Det. Cope was voluntary and her statements were not the result of any threat or improper inducement. Significantly, Kimiko ended the second interview herself by requesting an attorney, after which she made no further statements. Accordingly, we find that the trial court did not err by overruling Kimiko's motion to suppress the statements that she made during the first and second interviews.

{¶ 41} Kimiko's first assignment of error is overruled.

{¶ 42} Kimiko's second assignment of error is as follows:

{¶ 43} "THE TRIAL COURT ERRED BY OVERRULING MS. HARDY'S MOTION TO DISMISS."

{¶ 44} In her second assignment, Kimiko argues that she should only have been found guilty of Count III, failure to confine a vicious dog (dog kills person), in violation of R.C. 955.22(C)(2), a felony of the fourth degree, because that is the more specific offense, and the remaining five counts are all general offenses.

{¶ 45} R.C. 1.51 provides:

> If a general provision conflicts with a special or local provision, they shall be construed, if possible, so that effect is given to both. If the conflict between the provisions is irreconcilable, the special or local provision prevails as an exception to the general provision, unless the general

provision is the later adoption and the manifest intent is that the general provision prevail.

{¶ 46} In *State v. Volpe,* 38 Ohio St.3d 191, 527 N.E.2d 818 (1988)*,* the Ohio Supreme Court noted that R.C. 2915.02 prohibits criminal possession and control of a gambling device and classifies such conduct as a misdemeanor. *Id.* at paragraph 2 of the syllabus. The court therefore determined that under R.C. 1.51, the defendant could not be charged with a felony under R.C. 2923.24 for possession and control of criminal tools in connection with the possession of gambling devices. *Id.* at 194. The court found that if a general provision and a special provision are in conflict, the special provision takes precedence unless there is a manifest legislative intent that a general provision of the Revised Code prevail over a special provision. *Id.*

{¶ 47} In *State v. Chippendale*, 52 Ohio St.3d 118, 556 N.E.2d 1134 (1990), the Ohio Supreme Court further held that "where the legislative intent is manifest that general and special provisions be applied coextensively and where the provisions are allied offenses of similar import, then the prosecution may charge on and try both, but the defendant may be sentenced upon his or her conviction for only one of the offenses." *Id.* at 122.

{¶ 48} The *Chippendale* court explained:

> To summarize, R.C. 1.51 comes into play only when a general and a special provision constitute allied offenses of similar import and additionally do not constitute crimes committed separately or with a separate animus for each crime. When this is the case, we must proceed with our analysis of R.C. 1.51.

Where it is clear that a general provision of the Criminal Code applies coextensively with a special provision, R.C. 1.51 allows a prosecutor to charge on both. Conversely, where it is clear that a special provision prevails over a general provision or the Criminal Code is silent or ambiguous on the matter, under R.C. 1.51, a prosecutor may charge only on the special provision. The only exception in the statute is where " * * * the general provision is the later provision and the manifest intent is that the general provision prevail." Thus, unless the legislature enacts or amends the general provision later in time and manifests its intent to have the general provision apply coextensively with the special provision, the special provision must be the only provision applied to the defendant.

*Id.* at 120 -121.

**{¶ 49}** Therefore, in determining the applicability of R.C. 1.51, we must first ascertain whether the statutes at issue in the instant case present an irreconcilable conflict. Such a conflict arises when the same conduct receives different penalties under two different statutes. *Chippendale*, 52 Ohio St.3d at 120. If the offenses are not allied offenses of similar import they are not irreconcilable under R.C. 1.51. *See State v. Davis,* 9th Dist. Summit No. 21762, 2004-Ohio-3704, ¶ 6.

**{¶ 50}** As previously discussed, Kimiko was charged with two counts of involuntary manslaughter (misdemeanor), in violation of R.C. 2903.04(B), both felonies of the third degree (Counts I and II); one count of failure to confine a vicious dog (dog kills person), in violation of R.C. 955.22(C)(2) and R.C. 955.99(H)(1)(a), a felony of the fourth degree (Count III); one count of involuntary manslaughter (felony), in violation of R.C. 2903.04(A),

a felony of the first degree (Count IV); one count of endangering children (parent-serious harm), in violation of R.C. 2919.22(A), a felony of the third degree (Count V); and one count of involuntary manslaughter (felony child endangering), in violation of R.C. 2903.04(A), a felony of the first degree (Count VI).

{¶ 51} R.C. 955.22(C)(2) provides as follows:

(C) Except when a dog is lawfully engaged in hunting and accompanied by the owner, keeper, harborer, or handler of the dog, no owner, keeper, or harborer of any dog shall fail at any time to

\*\*\*

(2) Keep the dog under the reasonable control of some person.

{¶ 52} R.C. 955.99(H)(1)(a) states in pertinent part:

(H)(1) Whoever commits a violation of division (C) of section 955.22 of the Revised Code that involves a vicious dog is guilty of one of the following:

(a) A felony of the fourth degree if the dog kills a person. Additionally, the court shall order that the vicious dog be humanely destroyed by a licensed veterinarian, the county dog warden, or the county humane society at the owner's expense.

{¶ 53} Involuntary manslaughter pursuant to R.C. 2903.04(B) provides in pertinent part that "[n]o person shall cause the death of another \*\*\* as a proximate result of the offender's committing or attempting to commit a misdemeanor of any degree, a regulatory offense, or a minor misdemeanor." Involuntary manslaughter pursuant to R.C. 2903.04(A) provides that "[n]o person shall cause the death of another \*\*\* as a proximate result of the offender's committing or attempting to commit a felony." Finally,

endangering children pursuant to R.C. 2919.22(A) states in pertinent part that "[n]o person, who is the *** person having custody or control *** of a child under eighteen years of age *** shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support."  Endangering children rises to a felony offense if the violation "results in serious physical harm to the child involved." R.C. 2919.22(E)(2)(c). The endangering children statute does not contain an enhanced penalty provision addressing a situation where the offense results in the death of the child.  *See* R.C. 2919.22(E).

{¶ 54} With respect to R.C. 955.22(C), we stated the following in *State v. Squires*, 108 Ohio App.3d 716, 671 N.E.2d 627 (2d Dist.1996):

> Though the owner of a dog who permits it to roam at large may have a bad purpose in doing so, there is no bad purpose inherent in the conduct prohibited by R.C. 955.22(C), failing to keep a dog confined to its owner's premises. The concern of the statute is not the conduct of the owner but the potential for injury to persons and damage to their property presented by roaming dogs and the potential for injury to the animal involved. Therefore, the statute imposes a duty on the dog's owner to keep it confined, and it makes the owner criminally liable for a breach of that duty regardless of how it came about. The statute thus plainly indicates a purpose to impose criminal liability strictly for the conduct it prohibits, not because of the culpability of the actor in committing it.

*Id.* at 718-719; *see also State v. Thaler*, 2d Dist. Montgomery No. 22579, 2008-Ohio-5525 (holding that R.C.G.O. 91.50 is a strict liability offense).

{¶ 55} In order to prove Kimiko was guilty of involuntary manslaughter in Counts I and II, the State had to show that she caused the death of J.Q. as a proximate result of committing or attempting to commit a misdemeanor. R.C. 2903.04(B). In order to prove Kimiko was guilty of involuntary manslaughter in Counts IV and VI, the State had to show that she caused the death of J.Q. as a proximate result of committing or attempting to commit a felony. R.C. 2903.04(A). "The culpable mental state for involuntary manslaughter is that of the underlying offense." *State v. Hancher,* 2d Dist. Montgomery No. 23515, 2010–Ohio–2507, ¶ 67 (citation omitted). The underlying offense must be one "which, while taken without an intention to kill, was performed in circumstances in which a reasonable person would foresee that it would cause the death of the victim." *State v. Gunnell,* 2d Dist. Clark No. 09-CA-0013, 2010-Ohio-4415, ¶ 185, citing *State v. Ziko,* 71 Ohio App.3d 832, 837, 595 N.E.2d 1019 (8th Dist.1991). "Involuntary manslaughter involves a lesser mental state as it is a killing which proximately results from the defendant's committing or attempting to commit another offense." *State v. Johnson,* 6 Ohio St.3d 420, 424, 453 N.E.2d 595 (1983), *reversed on other grounds,* 467 U.S. 493, 104 S.Ct. 2536, 81 L.Ed.2d 425 (1984).

{¶ 56} Additionally, the culpable mental state for child endangering is recklessness. *State v. Isaac,* 5th Dist. Richland No. 16CA19, 2016-Ohio-8249, ¶ 27. "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to

exist." R.C. 2901.22(C). Where serious physical harm results, as it did in this case, the offense is a felony of the third degree. R.C. 2919.22(E)(1)(c).

{¶ 57} Upon review, we conclude that R.C. 2903.04, R.C. 2919.22, and R.C. 955.22(C) do not provide different penalties for the same conduct, and they can accordingly be construed to give effect to each of the statutes. In other words, the statutes are not irreconcilable, and analysis pursuant to R.C. 1.51 is not required. R.C. 955.22 is a strict liability offense, and therefore, has no mens rea. In order to prove involuntary manslaughter, however, the State has to establish proximate cause and foreseeability. In order to prove child endangering, the State has to establish that the defendant acted recklessly. Thus, R.C. 955.22 is not a specific provision to the general provision of either R.C. 2903.04 or R.C. 2919.22. *Accord State v. Venditti*, 134 Ohio App.3d 326, 329, 731 N.E.2d 184 (9th Dist.1999). Based upon the foregoing, the trial court did not err when it overruled Kimiko's motion to dismiss pursuant to R.C. 1.51.

{¶ 58} Kimiko's second assignment of error is overruled.

{¶ 59} Kimiko's third assignment of error is as follows:

{¶ 60} "THE TRIAL COURT ERRED BY OVERRULING MS. HARDY'S MOTION IN LIMINE REGARDING THE USE OF OTHER ACTS EVIDENCE."

{¶ 61} In her third assignment, Kimiko contends that the trial court erred when it overruled her motion in limine and allowed the State to adduce evidence of Busa's prior attacks on the mail carrier and other dog in the months leading up to Busa's fatal attack on J.Q.

{¶ 62} Evid.R. 404(B) provides:

(B) Other crimes, wrongs or acts. Evidence of other crimes, wrongs,

or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this rule shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

**{¶ 63}** Evid.R. 403(A) provides:

Exclusion mandatory. Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.

**{¶ 64}** We have followed established precedent holding that Evid.R. 404(B) must be strictly construed against the admissibility of other-bad-act evidence. *State v. Shaw,* 2d Dist. Montgomery No. 21880, 2008–Ohio–1317, citing *State v. Broom,* 40 Ohio St.3d 277, 533 N.E.2d 682 (1988). "The courts in Ohio have long recognized that evidence of other crimes, wrongs or bad acts carries the potential for the most virulent kind of prejudice for the accused." *Id.* at ¶ 13. The Supreme Court of Ohio has established the following three-part test for the admission of 404(B) testimony:

The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401. The next step is to consider whether evidence of the other crimes, wrongs,

or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B). The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice. *See* Evid.R 403.

*State v. Williams,* 134 Ohio St.3d 521, 2012–Ohio–5695, 983 N.E.2d 1278, ¶ 20.

**{¶ 65}** The admission of other-bad-acts evidence under Evid.R. 404(B) "lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created *material prejudice.*" *State v. Perez,* 124 Ohio St.3d 122, 2009–Ohio–6179, 920 N.E.2d 104, ¶ 96, citing *State v. Diar,* 120 Ohio St.3d 460, 2008–Ohio–6266, 900 N.E.2d 565, ¶ 66 (emphasis added). "Prejudice occurs if there is a reasonable possibility that the error might have contributed to the conviction." *State v. Cowans,* 10 Ohio St.2d 96, 104–105, 227 N.E.2d 201 (1967).

**{¶ 66}** In her third assignment, Kimiko argues that the trial court erred when it permitted the State to introduce evidence regarding Busa's prior attacks on the mail carrier and Crickmore's dog which occurred just before Busa's fatal attack on J.Q. Specifically, Kimiko contends that the evidence of the prior attacks was not relevant in the instant case because neither attack "was substantially similar to the events that led to [J.Q.]'s death in that both of these prior incidents took place outside the home, and neither involved an attack similar to what occurred in the present matter." Kimiko also argues that her knowledge of the prior attacks was not relevant to determining the foreseeability

of Busa's fatal attack of J.Q. on July 20, 2014. Lastly, Kimiko argues that the probative value of the prior attacks is substantially outweighed by the danger of unfair prejudice which resulted from the admission of said evidence.

{¶ 67} Upon review, we conclude that the two prior attacks were directly relevant to Kimiko's knowledge of Busa's aggressive and hostile behavior at the time of the fatal attack on J.Q. Kimiko was clearly aware of both incidents at the time of J.Q.'s death. Moreover, Kimiko was required to take an animal awareness class sponsored by the ARC because of Busa's attack on the mail carrier. Kimiko also had several interactions with ARC officers because of Busa's prior attacks. During trial, the State was required to prove that Kimiko acted recklessly (child endangering), and that the fatal attack was foreseeable (involuntary manslaughter). Here, the evidence of Busa's prior attacks was not used to establish that Kimiko's conduct on the date of J.Q.'s death conformed to a particular character trait. Rather, Hardy's knowledge of Busa's prior attacks was relevant in determining the foreseeability that Busa would attack J.Q. when he stayed at her house on July 20, 2014.

{¶ 68} Furthermore, the fact that the prior attacks occurred outside the residence while J.Q.'s mauling occurred inside the house is immaterial to our analysis. Whether Busa committed the prior attacks inside or outside the house is irrelevant because the purpose of the evidence was to establish that Kimiko had knowledge of the dog's hostile and aggressive nature when J.Q. was killed.

{¶ 69} Therefore, the evidence of Busa's prior attacks satisfied the first two steps of the *Williams* analysis. With respect to the third prong of the *Williams* analysis, exclusion of relevant evidence is mandatory where the "probative value [of the evidence]

is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). For the evidence to be excluded on this basis, "the probative value must be minimal and the prejudice great." *State v. Morales,* 32 Ohio St.3d 252, 257, 513 N.E.2d 267 (1987). The introduction of evidence regarding Busa's prior attacks on the mail carrier and Crickmore's dog which occurred just before Busa's fatal attack on J.Q. was relevant and not unfairly prejudicial to Kimiko. Evidence regarding the prior attacks was highly probative as it established that Kimiko had prior knowledge of Busa's aggressive and violent nature. Unfavorable evidence is not equivalent to unfairly prejudicial evidence. *State v. Bowman,* 144 Ohio App.3d 179, 185, 759 N.E.2d 856 (12th Dist.2001). Accordingly, we find the trial court did not err in admitting evidence regarding the two prior attacks as the danger of unfair prejudice was minimal and did not substantially outweigh the probative value of the evidence.

{¶ 70} Kimiko's third assignment of error is overruled.

{¶ 71} Kimiko's fourth assignment of error is as follows:

{¶ 72} "MS. HARDY WAS DENIED HER CONSTITUTIONALLY GUARANTEED RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL."

{¶ 73} In her fourth assignment, Kimiko argues that her trial counsel was deficient for failing to request a limiting instruction regarding the evidence of Busa's prior attacks on the mailman and Crickmore's dog. Kimiko also argues that she received ineffective assistance when her trial counsel failed to request a limiting instruction regarding her own characterization of Busa as "vicious" during her interviews with the detectives conducted immediately after J.Q.'s death. Furthermore, Kimiko argues that her counsel should have requested that the trial court define "vicious" for the jury.

**{¶ 74}** To reverse a conviction based on ineffective assistance of counsel, an appellant must demonstrate both that trial counsel's conduct fell below an objective standard of reasonableness and that the errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland,* 466 U.S. at 688.

**{¶ 75}** "When evidence which is admissible * * * for one purpose but not admissible * * * for another purpose is admitted, the court, upon request of a party, shall restrict the evidence to its proper scope and instruct the jury accordingly." Evid.R. 105.

**{¶ 76}** Counsel's decision not to request a limiting instruction may have been a strategic decision in order to avoid drawing further attention to Kimiko's knowledge of Busa's aggressive nature based upon the prior attacks. Trial strategy decisions will not be the basis of a finding of ineffective assistance. *State v. Dixon,* 101 Ohio St.3d 328, 2004–Ohio–1585, 805 N.E.2d 1042, ¶ 52. Moreover, even if trial counsel should have requested a limiting instruction, Kimiko must still demonstrate that she was prejudiced by counsel's failure in order to prevail upon an ineffective assistance of counsel claim. For the reasons discussed in response to Kimiko's Third Assignment of Error, we conclude that it is unlikely that a lack of a limiting instruction caused the jury's finding of guilt. In other words, we conclude that it is unlikely that Kimiko would have been acquitted if the instruction had been given. By adducing evidence regarding Busa's prior attacks on the mail carrier and Crickmore's dog, the State sought to establish that Kimiko had knowledge

of Busa's dangerous nature and that J.Q.'s death was not merely an accident, but a foreseeable event that could have been avoided had the proper precautions been taken.

**{¶ 77}** In *State v. Tisdale*, 2d Dist. Montgomery No. 19346, 2003–Ohio–4209, we concluded that trial counsel did not render ineffective assistance where counsel failed to request any limiting instruction on the admission of evidence of prior acts under Evid.R 404(B). *Id*. at ¶ 48. We commented that while we had "recognized that a defendant is entitled to an appropriate instruction limiting the scope of a jury's consideration of potentially prejudicial evidence that is admitted for a very limited purpose, we have also recognized that a defendant may decide, as a matter of trial strategy, not to request a limiting instruction because of concerns that it will only emphasize in the juror's minds the evidence of other criminal acts committed by defendant to which the instruction applies, thereby reinforcing the prejudice." *Id.*, citing *State v. McDaniel,* 2d Dist. Clark No. 2853, 1992 WL 206759 (Aug. 19, 1992).

**{¶ 78}** Further, we find that trial counsel was not ineffective for failing to request a definition of "vicious" or limiting instruction thereon. It is undisputed that Busa attacked and killed seven-month old J.Q. as he sat in his car seat on the living room floor of Kimiko's residence. The attack was unprovoked, and based upon Busa's prior aggressive behavior, Kimiko was aware (had knowledge) that the dog was potentially very dangerous. By failing to request an instruction on "vicious", trial counsel may have been trying to avoid emphasizing Busa's dangerous nature in the jurors' minds. Thus, we conclude that it is unlikely that Kimiko would have been acquitted if the instruction had been given.

**{¶ 79}** Kimiko's fourth assignment of error is overruled.

{¶ 80} Because they are interrelated, Kimiko's fifth and sixth assignments of error will be discussed together as follows:

{¶ 81} "THE TRIAL COURT ERRED BY OVERRULING MS. HARDY'S MOTION FOR ACQUITTAL SINCE THE STATE FAILED TO SUPPLY SUFFICIENT EVIDENCE AS TO ALL THE ELEMENTS NECESSARY TO SUPPORT THE CHARGES AGAINST MS. HARDY."

{¶ 82} "THE JURY'S VERDICTS SHOULD BE REVERSED AS THEY ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶ 83} In her fifth assignment, Kimiko contends that the trial court erred when it overruled her Crim.R. 29 motion for acquittal made at the close of evidence.   In her sixth assignment, Kimiko argues that her convictions were against the manifest weight of the evidence.

{¶ 84} Crim. R. 29(A) states that a court shall order an entry of judgment of acquittal if the evidence is insufficient to sustain a conviction for the charged offense. "Reviewing the denial of a Crim. R. 29(A) motion therefore requires an appellate court to use the same standard as is used to review a sufficiency of the evidence claim." *State v. Witcher,* 6th Dist. Lucas No. L–06–1039, 2007-Ohio-3960, ¶ 20.   "In reviewing a claim of insufficient evidence, '[t]he relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " (Citations omitted). *State v. Crowley,* 2d Dist. Clark No. 2007 CA 99, 2008-Ohio-4636, ¶ 12.

{¶ 85} "A challenge to the sufficiency of the evidence differs from a challenge to the manifest weight of the evidence." *State v. McKnight,* 107 Ohio St.3d 101, 2005-Ohio-

6046, 837 N.E.2d 315, ¶ 69. "A claim that a jury verdict is against the manifest weight of the evidence involves a different test. 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " (Citations omitted.) *Id.* at ¶ 71.

**{¶ 86}** The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve. *State v. DeHass,* 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson,* 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997).

**{¶ 87}** This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *State v. Bradley,* 2d Dist. Champaign No. 97–CA–03, 1997 WL 691510 (Oct. 24, 1997).

**{¶ 88}** As previously discussed, "[t]he culpable mental state for involuntary manslaughter is that of the underlying offense." *State v. Hancher,* 2d Dist. Montgomery

No. 23515, 2010–Ohio–2507, ¶ 67. In order to prove Kimiko was guilty of involuntary manslaughter in Counts I and II, the State had to show that she caused the death of J.Q. as a proximate result of committing or attempting to commit a misdemeanor. R.C. 2903.04(B). In order to prove Kimiko was guilty of involuntary manslaughter in Counts IV and VI, the State had to show that she caused the death of J.Q. as a proximate result of committing or attempting to commit a felony. R.C. 2903.04(A). The underlying offense must be one "which, while taken without an intention to kill, *was performed in circumstances in which a reasonable person would foresee that it would cause the death of the victim.*" *State v. Gunnell*, 2d Dist. Clark No. 09-CA-0013, 2010-Ohio-4415, ¶ 185, citing *State v. Ziko*, 71 Ohio App.3d 832, 837, 595 N.E.2d 1019 (8th Dist.1991).

{¶ 89} Furthermore, the culpable mental state for child endangering is recklessness. *State v. Isaac*, 5th Dist. Richland No. 16CA19, 2016-Ohio-8249, ¶ 27. "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist." R.C. 2901.22(C). Where serious physical harm results, as it did in this case, the offense is a felony of the third degree. R.C. 2919.22(E)(1)(c).

{¶ 90} It is undisputed that Kimiko was the owner of Busa on July 20, 2014, when the dog fatally mauled J.Q. The evidence further established that in the three months prior to J.Q.'s death, Busa attacked the mail carrier, Freels, and attacked another dog. After each incident, ARC officers contacted Kimiko and advised her regarding how to

address Busa's dangerous behavior. Officer White recommended to Kimiko that she have Busa neutered in order to curb his aggressive behavior. At the ARC awareness program that Kimiko attended, she was again advised to have Busa neutered in order to render him more docile and trainable. Although Hardy was provided with ample information regarding how to reduce Busa's aggressiveness, she neither had Busa neutered nor did she obtain any additional training to correct his behavior. In fact, Kimiko admitted that she and her husband did not have Busa neutered because they wanted to breed him.

{¶ 91} Busa was a seventy-five pound pit bull which Kimiko was unable to control while walking him on her own. Evidence was adduced that Busa had previously broken off his chain in the yard, and the Hardys had to use a much heavier boat chain to restrain the dog and keep him in the yard. Kimiko testified that she had two large dog cages with locks in the basement that were reinforced with zip ties where she kept Busa. Prior to the attack on J.Q., Kimiko had been keeping Busa in a cage in the basement to keep him away from the baby. Additionally, Kimiko testified that she usually placed two baby gates in the doorway in order to keep Busa confined to one area of the house and out of the living room if he was not in a basement cage. However, on the day of J.Q.'s death, there was only one baby gate in place, ostensibly allowing Busa to jump into the living room where he was able to attack the baby. We also note that even though she was present at the time of the attack, Kimiko testified that she was unable to physically keep Busa from mauling J.Q. because of the dog's size and ferocity.

{¶ 92} Construing the evidence presented in a light most favorable to the State, as we must, we conclude that a rational trier of fact could find all of the essential elements

of the crimes for which Kimiko was indicted and found guilty to have been proven beyond a reasonable doubt. Kimiko's convictions for the instant offenses were therefore supported by legally sufficient evidence.

{¶ 93} Furthermore, having reviewed the record, we find no merit in Kimiko's manifest-weight challenge. It is well-settled that evaluating witness credibility is primarily for the trier of fact. *State v. Benton,* 2d Dist. Miami No. 2010–CA–27, 2012–Ohio–4080, ¶ 7. Here the jury quite reasonably could have credited the extensive testimony provided by the State's witnesses, applied said evidence and all reasonable inferences to the elements of the offenses, and thereafter, found Kimiko guilty. Having reviewed the entire record, we cannot clearly find that the evidence weighs heavily against conviction, or that a manifest miscarriage of justice has occurred.

{¶ 94} Kimiko's fifth and sixth assignments of error are overruled.

{¶ 95} All of Kimiko's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

HALL, P.J. and TUCKER, J., concur.

Copies mailed to:

Heather N. Jans
Marshall G. Lachman
Hon. Mary L. Wiseman