[Cite as *State v. Dean*, 2018-Ohio-1317.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CHAMPAIGN COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case No. 2017-CA-19 |
| | : | |
| v. | : | Trial Court Case No. 2017-CR-19 |
| | : | |
| MICHAEL A. DEAN | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| *Defendant-Appellant* | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 6th day of April, 2018.

. . . . . . . . . . .

JANE A. NAPIER, Atty. Reg. No. 0061426, Assistant Prosecuting Attorney, Champaign County Prosecutor's Office, 200 North Main Street, Urbana, Ohio 43078
    Attorney for Plaintiff-Appellee

KRISTA GIESKE, Atty. Reg. No. 0080141, 810 Sycamore Street, Third Floor, Cincinnati, Ohio 45202
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Defendant-appellant, Michael A. Dean, appeals from his conviction and sentence in the Champaign County Court of Common Pleas after a jury found him guilty of assault, resisting arrest, and felonious assault. In support of his appeal, Dean contends that his trial counsel provided ineffective assistance by failing to raise the issue of his competency to stand trial. Additionally, Dean contends that the trial court erred in permitting the State to present inadmissible evidence at trial of other crimes, wrongs or acts in violation of Evid.R. 404(B). Dean also contends that the offenses for which he was convicted are allied offenses of similar import that should have merged for purposes of sentencing. Finally, Dean also challenges the trial court's imposition of financial sanctions. For the reasons outlined below, the judgment of the trial court will be affirmed.

**Facts and Course of Proceedings**

{¶ 2} On January 5, 2017, the Champaign County Grand Jury returned a four-count indictment charging Dean with aggravated menacing in violation of R.C. 2903.21(A), a first-degree misdemeanor; assault of a peace officer in violation of R.C. 2903.13(A)(C)(5), a fourth-degree felony; resisting arrest in violation of R.C. 2921.33(C)(2), also a fourth-degree felony; and felonious assault of a peace officer in violation of R.C. 2903.11(A)(2), (D)(1)(a), a first-degree felony. The felonious assault charge included a repeat violent offender specification under R.C. 2941.149(A).

{¶ 3} The charges originated from an incident at a Dollar General store in Urbana, Ohio, where Dean allegedly threatened to blow up the store, shoot one of the employees, and blow up the employee's car. Following this incident, the police went to Dean's

residence where they attempted to arrest Dean for violating the conditions of his post-release control due to his conduct at Dollar General. During that encounter, Dean allegedly struck a police officer in the face with his fist and failed to comply with various police commands. It was also alleged that Dean brandished a hammer, which he threw at a police officer, striking the officer in the chest.

{¶ 4} After being indicted, Dean pled not guilty to the charges and the matter was scheduled for a jury trial. Prior to trial, Dean filed a motion in limine to preclude the State from introducing evidence at trial of other crimes, wrongs or acts pursuant to Evid.R. 404(B). Specifically, Dean sought to exclude evidence that he: (1) previously acted in a hostile manner at the same Dollar General a month prior to the incident in question; (2) made rude comments to his grandmother during the prior incident at Dollar General; (3) was on post-release control at the time the indicted offenses took place; and (4) had previous encounters with the police.

{¶ 5} On May 8, 2017, after holding a hearing on the matter, the trial court issued a decision denying Dean's request to exclude evidence of the prior incident at Dollar General. In reaching that decision, the trial court determined that such "other act" evidence was relevant to establish Dean's identity, which is permissible under Evid.R. 404(B). At trial, the court further explained that evidence of the prior incident was also relevant to establish the belief-of-serious-physical-harm element of the aggravated menacing charge.

{¶ 6} Dean's request to exclude evidence of rude comments he allegedly made to his grandmother during the prior incident at Dollar General was initially denied by the trial court. However, in order to prevent undue prejudice, the trial court later changed its

ruling at trial and ultimately prohibited the State from eliciting any evidence regarding the rude comments.

{¶ 7} The trial court, on the other hand, denied Dean's request to exclude evidence indicating that he was on post-release control. The trial court found that Dean's post-release control status was a necessary fact in establishing the lawful-arrest element of the resisting arrest charge since the arrest was based on Dean violating the conditions of his post-release control.

{¶ 8} Dean's request to exclude evidence regarding his prior encounters with police was granted in part and denied in part by the trial court. In granting Dean's request, the trial court ordered that an audio recording of Dean's encounter with police be redacted to omit certain statements by the officers that indicated Dean had 100 prior police encounters. The trial court ordered the redaction because the court found that the statements were inaccurate and merely colloquial in nature.

{¶ 9} Following the trial court's decision on Dean's motion in limine, the matter proceeded to a two-day jury trial. At trial, the State presented the testimony of Dollar General employee Anne Dingey. Dingey testified that she was working on December 21, 2016, when Dean and his grandmother entered the Dollar General. Dingey claimed that she was standing behind Dean and his grandmother putting away baskets and carts when she heard Dean mumble "b****" under his breath. After Dingey heard this, she decided to stay at the front of the store with the other cashier, Kandyce Kemp. Dingey testified that she decided to stay up front with Kemp because Dean was in the store a month prior and was very hostile and used foul language such as "these stupid b******" and "dumb m***** f******." Trial Trans. (May 24, 2017), p. 150. Dingey testified that

Dean's behavior on that prior occasion made her nervous.

{¶ 10} Continuing, Dingey testified that while she was at the front of the store, Dean and his grandmother came to her register to check out. During that time, Dingey testified that Dean slid a jar on the counter very forcefully, smashing her middle finger. When Dingey yanked her hand back, she observed Dean give her an "ugh" look. *Id.* at 160. According to Dingey, Dean then started mumbling "stupid b****" and "dumba**" under his breath. *Id.*

{¶ 11} After Dingey finished scanning their items, Dingey testified that Dean's grandmother began to retrieve money to pay, but because she moved very slowly, Dean grabbed the money from his grandmother and handed it to Dingey. When Dingey went to give Dean's grandmother her change back, Dingey claimed that Dean grabbed her hand and took the change. Dingey said she tried to ask Dean's grandmother if she wanted a receipt, but was interrupted by Dean calling her a "dumb b****," "stupid," and "an absolute dumb m***** f*****." *Id.* at 161.

{¶ 12} Following Dean's remarks, Dingey testified that she asked Dean to be respectful, but he continued to use profanity toward her. At that point, Dingey told Dean to leave the store and Dean responded by whispering "Are you okay?" Trial Trans. (May 24, 2017), p. 162. Dingey testified that she responded "I'm fine. But * * * you seem very angry." *Id.* After making that comment, Dingey claimed that Dean "exploded" and told her that he was going to come back and blow up the store, shoot her, and blow up her vehicle. *Id.* Thereafter, Dingey testified that she once again told Dean to leave the store, and as he left, he threatened to kill her.

{¶ 13} Dingey testified that Dean's threats scared her and that she believed the

threats were real. As a result, when Dean left the store, Dingey went outside and obtained Dean's license plate information. While getting the information, she observed Dean ram a shopping cart into the sidewalk causing the cart to crash and flip over. Dingey also observed Dean yelling profanities and complaining about the sidewalk not being shoveled. Dingey then testified that Dean once again threatened to shoot and kill her, and made a gesture with his hand as if it were a gun while yelling "bang, bang, bang." *Id.* at 184.

{¶ 14} After Dean and his grandmother were gone, Dingey testified that she called the Dollar General district manager. Thereafter, the police arrived at the scene and Dingey reported the incident to Officer Steve Molton of the Urbana Police Department. Dingey testified that the district manager also arrived at the scene and provided Officer Molton with the store's surveillance video, which Officer Molton used to identify Dean.

{¶ 15} Dingey's co-worker, Kandyce Kemp, also testified at trial. Kemp confirmed that Dingey stayed at the front of the store after Dean called Dingey a "b****" while she was putting away baskets and carts. Kemp also confirmed that Dingey seemed nervous after Dean's comment, and later observed Dean use profanities while Dingey was scanning his items. Kemp further observed Dean go "off the handle" when Dingey told him he seemed angry. Trial Trans. (May 24, 2017), p. 202. According to Kemp, Dean called Dingey a "f****** b****" and told Dingey "I'm going to shoot you." *Id.* Kemp also observed Dean flip a shopping cart over outside the store and heard him threaten to blow up the store.

{¶ 16} In addition to Dingey and Kemp's testimony, Officer Molton testified that he was dispatched to the Dollar General in Urbana, Ohio, regarding a disturbance involving

a male customer who allegedly made threats to blow up the store and shoot one of its employees. Molton testified that one of the store's employees provided him with the customer's license plate number. From that information, Molton determined that the customer's vehicle belonged to Blanche Outram of 439 East Church Street, Urbana, Ohio. Molton testified that he was familiar with Outram and was aware that she resided with her grandson, Dean, who matched the description of the male customer in question. Molton also testified that he was able to positively identify Dean as the male customer using the surveillance video provided by Dollar General's district manager.

{¶ 17} In addition to recognizing Dean, Molton testified that he was aware Dean was on post-release control. As a result, Molton contacted Chris Caughman of the Adult Parole Authority, and advised him of the allegations against Dean. Caughman also testified at trial and confirmed that he worked for the Adult Parole Authority and served as Dean's post-release control supervisor. Caughman testified that Molton apprised him of the December 21, 2016 incident at Dollar General, which led him to authorize Dean's arrest for violating the conditions of his post-release control.

{¶ 18} After receiving instructions to arrest Dean, Molton testified that he requested his supervising officer, Sergeant Chris Snyder, to meet him at Dean's residence and assist him with the arrest. Upon arriving at the residence, Molton testified that he knocked on the door and made contact with Dean, who permitted him inside the residence to discuss the incident at Dollar General. Molton testified that he activated a digital audio recorder on his person in order to record the encounter. The State admitted the audio recording into evidence as State's Exhibit No. 1 and played it for the jury.

{¶ 19} The audio recording establishes that Molton asked Dean about the incident

at Dollar General and that Dean made various complaints about the store's employees. Dean and his grandmother also denied the accusation that Dean threatened to blow up the store and shoot one of the employees. The recording indicates that Molton advised Dean that "Chris" (Dean's post-release control supervisor) wants him "picked up" and that Dean was going to have to come with Molton. At that point, Dean says "let me use the bathroom." In response, Molton says "I'm going to have to go with you" followed by a lot of rustling and a voice yelling "hammer." A few moments later, Molton and another officer can be heard giving various commands to Dean including "drop the hammer," "get on the ground," "put your hands out in front of you," and "down."

{¶ 20} In response to the officers' commands, Dean can be heard saying "shoot me." Thereafter, another voice can be heard saying "he threw the hammer at Steve." Dean then once again yells for the officers to shoot him. However, instead of shooting Dean, the officers continue to give multiple commands such as "Michael come out here," "put your hands up," "turn around and put your hands up," and "put your hands behind your back." Meanwhile, Dean continues to yell for the officers to shoot him and at one point says: "I'm going to die right? I want to, I want to make sure I die. Pull the f****** trigger right f****** here."

{¶ 21} Shortly after Dean's comments, one of the officers can be heard saying "he's running," followed by a lot of heavy breathing and coughing. Dean then says: "They sprayed mace may-maw. They sprayed mace, ok? I love you, alright?" A few moments later, Molton can be heard saying "my glasses went flying" and then speaks to Dean's grandmother about finding his glasses. Molton also tells Dean's grandmother that "[Dean] came at us with a hammer and refused to comply." Molton later explains to

another officer how Dean came at him with a hammer and hit him in the face a couple times with his fist.

{¶ 22} After the recording was played for the jury, Officer Molton testified that his conversation with Dean was initially laid back and casual, but turned combative after he told Dean he was going to accompany him to the bathroom.   Specifically, Molton testified that as he stepped toward Dean, Dean spun around and hit Molton in the face with a closed fist, causing his glasses to fly off his face.   Thereafter, Molton testified that he grabbed Dean's upper body, but Dean broke away from his hold and ran into the bathroom.

{¶ 23} Once Dean was in the bathroom, Molton testified that Dean turned around and wielded a hammer over his head.   In response, Molton drew his weapon and yelled "hammer" in an effort to notify Sergeant Snyder of the threat.   Molton testified that he gave several commands for Dean to drop the hammer, but Dean did not comply. Instead, Molton testified that Dean threw the hammer at him, which struck Molton in the chest.   Molton testified that he was not injured by the hammer because he was wearing a Kevlar vest.   The county coroner, Dr. Josh Richards, testified to a reasonable degree of medical certainty that the hammer thrown at Molton is a weapon capable of causing death, i.e., a deadly weapon.

{¶ 24} After being struck by the hammer, Molton testified that Dean stood facing him with his fists clenched and started to yell for the officers to shoot him.   In response, Molton testified that Sergeant Snyder made several commands for Dean to put his hands behind him.   After Dean failed to comply, Molton testified that Snyder sprayed Dean with pepper spray and chased Dean into the kitchen where Snyder eventually placed Dean in

custody.

**{¶ 25}** In addition to Molton's testimony, Sergeant Snyder testified that he initially stood in the doorway of Dean's residence and observed Molton talking to Dean and Dean's grandmother about the incident at Dollar General. Snyder testified that he observed Dean hit Molton after Molton attempted to accompany Dean to the bathroom. Snyder also testified that he then went inside the residence to intervene and help subdue Dean. Snyder claimed he heard Molton yell "hammer" and then observed Dean holding a hammer over his head. Snyder testified that Molton gave multiple commands for Dean to drop the hammer, but Dean instead threw the hammer at Molton. According to Snyder, Dean yelled for the officers to shoot him and would not comply with the officers' commands to get down on the ground and put his hands behind his head. As a result, Snyder testified that he sprayed Dean with pepper spray, which ultimately caused Dean to surrender.

**{¶ 26}** Next, Officer Michael Hughes testified that he was sitting in his vehicle outside Dean's residence when Snyder radioed him to come into the residence. When Hughes entered the residence, he observed Molton and Snyder with their firearms drawn. Hughes testified that Snyder advised him that Dean had just thrown a hammer at Molton. Hughes then heard Dean yell "shoot me." After Dean failed to comply with the officers' orders to put his hands behind his back, Hughes testified that Snyder pulled out his pepper spray and sprayed Dean. Hughes claimed Dean then ran into the kitchen where Snyder was able to place him in custody.

**{¶ 27}** After presenting the foregoing testimony and evidence, the State rested its case. In his defense, Dean declined to call any witnesses, but admitted evidence of the

surveillance video and photographs of Molton's face and glasses following the encounter with Dean. Dean then rested his case and the trial court provided jury instructions to the jurors. Following the jury instructions, the jury deliberated and found Dean not guilty of aggravated menacing, but guilty of assaulting a peace officer, resisting arrest, and felonious assault of a peace officer. The trial court also found that Dean was a repeat violent offender and convicted Dean of the repeat violent offender specification under R.C. 2941.149.

{¶ 28} At sentencing, the trial court sentenced Dean to 18 months in prison for the assault charge, 18 months in prison for the resisting arrest charge, 11 years in prison for the felonious assault charge, and 10 years in prison for the repeat violent offender specification. The trial court also imposed an additional 699 days in prison for Dean's post-release control violation. All the prison terms were ordered to be served consecutively to one another; accordingly, Dean received an aggregate prison term of 25 years and 11 months.

{¶ 29} In addition to the prison time, the trial court imposed a $1,000 fine for the assault charge, a $1,000 fine for the resisting arrest charge, and a $5,000 fine for the felonious assault charge, for a total fine of $7,000. The trial court also ordered Dean to pay court costs and the costs of his legal fees and expenses.

{¶ 30} Dean now appeals from his conviction and sentence, raising four assignments of error for review.

**First Assignment of Error**

{¶ 31} Dean's First Assignment of Error is as follows:

APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL DUE TO DEFENSE COUNSEL'S FAILURE TO RAISE THE ISSUE OF APPELLANT'S COMPETENCY TO STAND TRIAL.

{¶ 32} Under his First Assignment of Error, Dean contends that his trial counsel was ineffective in failing to raise the issue of his competency to stand trial. We disagree.

{¶ 33} In order to succeed on an ineffective assistance claim, Dean must show that his trial counsel rendered deficient performance and that counsel's deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish deficient performance, Dean must prove that his trial counsel's performance fell below an objective standard of reasonable representation. *Id.* at 688; *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989). In evaluating counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances the challenged action 'might be considered sound trial strategy.' " *Strickland* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955).

{¶ 34} To show prejudice, defendant must establish that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing *Strickland* at 687-688, 694; *Bradley* at paragraph two of the syllabus. The failure to make a showing of either deficient performance or prejudice defeats a claim of ineffective assistance of counsel. *Strickland* at 697.

{¶ 35} As previously noted, Dean contends that his trial counsel provided ineffective assistance in failing to raise the issue of his competency to stand trial. "R.C. 2945.37 states that a criminal defendant is presumed competent to stand trial unless it is established that he is unable to understand the nature of the proceedings and cannot assist in his defense." (Citation omitted.) *State v. Bryant*, 2d Dist. Miami No. 2016-CA-23, 2017-Ohio-5490, ¶ 18. "If a defendant 'lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense[,]' he may not stand trial." *State v. Matharu*, 2d Dist. Montgomery No. 26985, 2017-Ohio-8251, ¶ 11, quoting *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 155. " 'The right to a competency hearing rises to the level of a constitutional guarantee where the record contains sufficient "indicia of incompetence" to necessitate inquiry to ensure the defendant's right to a fair trial.' " *Bryant* at ¶ 18, quoting *State v. Ford*, 8th Dist. Cuyahoga No. 84138, 2004-Ohio-5610, ¶ 24, quoting *State v. Berry*, 72 Ohio St.3d 354, 359, 650 N.E.2d 433 (1995).

{¶ 36} In this case, Dean claims that his trial counsel should have questioned his competence to stand trial due to the behavior he exhibited on December 21, 2016, and while at court. Specifically, Dean points to the explosive behavior he exhibited toward Anne Dingey and toward the police officers during his arrest, noting that he quickly went from being casual and laid back to combative. Dean also claims he displayed "aberrant" behavior during the trial court proceedings when he failed to stand for the jury on two separate occasions, for which he was admonished by the trial court. Dean also points to his refusal to speak on his own behalf at sentencing and to various inarticulate comments he made in response to the trial court's questions at sentencing.

{¶ 37} At no point, however, has Dean maintained, nor does the record indicate, that Dean did not understand the nature of the court proceedings or that he could not assist in his defense. We note that the audio recording of Dean's interaction with police establishes that Dean was able to respond to Officer Molton's questions without difficulty and that Dean showed no signs of cognitive impairment that would lead one to believe he would be unable to understand the nature of court proceedings and/or to assist in his defense. In this court's view, the record does not show an indicia of incompetence to stand trial, but rather indicia of a person who may suffer from anger-related problems or some other form of mental illness.

{¶ 38} As the Supreme Court of Ohio has stated, "the term 'mental illness' does not necessarily equate with the definition of legal incompetency. Legal incompetence has a specific meaning [as set forth in R.C. 2945.37(G)]." *Berry*, 72 Ohio St.3d at 362, 650 N.E.2d 433. Therefore, "a person may suffer from a mental disability or illness and still be capable of understanding the proceedings against him and assisting in his own defense." *State v. McColgan*, 10th Dist. Franklin No. 04AP-120, 2005-Ohio-580, ¶ 22, citing *State v. Bock*, 28 Ohio St.3d 108, 110, 502 N.E.2d 1016 (1986); *State v. Rainwater*, 2d Dist. Montgomery No. 12056, 1991 WL 15967, *2 (Feb. 8, 1991).

{¶ 39} Based on our review of the record properly before this court, we cannot conclude that Dean's trial counsel erred by not requesting a competency evaluation or that if one had been requested, there is a reasonable probability that the result of the trial would have been different. Accordingly, Dean's First Assignment of Error is overruled.

**Second Assignment of Error**

{¶ 40} Dean's Second Assignment of Error is as follows:

THE TRIAL COURT ERRED IN PERMITTING THE ADMISSION OF HIGHLY PREJUDICAL OTHER ACTS EVIDENCE, THUS DEPRIVING APPELLANT OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL.

{¶ 41} Under his Second Assignment of Error, Dean contends that the trial court erred in permitting the State to elicit testimony at trial regarding Dean's presence and rude behavior at the Dollar General Store a month prior to the incident in question, as well as his status as a post-release control supervisee.   Dean maintains that this amounts to evidence of other crimes, wrongs or acts that is inadmissible at trial under Evid.R. 404(B).

{¶ 42} Evid.R. 404(B) provides that:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.    In criminal cases, the proponent of evidence to be offered under this rule shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

{¶ 43} "Generally, evidence of other acts is admissible if (1) it is offered for a purpose other than to prove the character of a person in order to show action in conformity with that character, Evid.R. 404(B), (2) it is relevant when offered for that purpose, Evid.R. 401, and (3) the danger of unfair prejudice does not substantially outweigh its probative value, Evid.R. 403." *State v. Goldblum*, 2d Dist. Montgomery No. 25851, 2014-Ohio-

5068, ¶ 32, citing *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 68, citing *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20.

**{¶ 44}** "A trial judge has considerable discretion to determine whether the specific evidence is of such a nature that it falls within one of the other purposes under Evid.R. 404(B) for which the evidence may be admitted." *Goldblum* at ¶ 32, citing *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 19. The Supreme Court of Ohio has stressed that "[u]nless the trial court has 'clearly abused its discretion and the defendant has been materially prejudiced thereby, this court should be slow to interfere' with the exercise of such discretion." *Kirkland*, at ¶ 67, quoting *State v. Hymore*, 9 Ohio St.2d 122, 128, 224 N.E.2d 126 (1967).

*Testimony Regarding Prior Incident at Dollar General*

**{¶ 45}** Dean claims that the portion of Anne Dingey's testimony indicating that Dean was behaving rudely at the Dollar General a month prior to the incident in question amounts to other-act evidence that was not offered for any of the permissible purposes outlined in Evid.R. 404(B), thus rendering it unfairly prejudicial. We disagree with Dean's claim.

**{¶ 46}** Dingey's testimony regarding her prior encounter with Dean at Dollar General was not presented for purposes of proving that Dean was acting in conformity with his character. Rather, the State's purpose in presenting this evidence was to demonstrate why Dingey initially felt threatened by Dean on the day in question and to further explain how she was able to identify him from her prior encounter with him. As

previously noted, Dingey testified that when Dean and his grandmother first arrived at the Dollar General on the day in question she was standing behind them putting away carts and baskets when she heard Dean mumble "b****" under his breath. Trial Trans. (May 24, 2017), p. 147. After that, Dingey testified that she went up to the front of the store to stay with the other cashier "[b]ecause prior to him coming to the store roughly a month before this he was very hostile. Very verbal with his profanity, his language. So automatically I went on defense." *Id.* at 158-159. Dingey also testified that Dean's language during the prior encounter made her nervous.

{¶ 47} Dingey's testimony regarding the prior encounter is relevant to the issue of whether Dingey believed that Dean would cause her serious physical harm for purposes of establishing the aggravated menacing charge. Her testimony is also relevant to how Dingey positively identified Dean, as she had not only one, but two rude encounters with him at the Dollar General. We agree with the State that even though there is other evidence in the record establishing Dean's identity, whether or not there was a need for Dingey's identification testimony is irrelevant in determining its admissibility under Evid.R. 404(B). *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 24, citing *State v. McNeill*, 83 Ohio St.3d 438, 442, 700 N.E.2d 596 (1998).

{¶ 48} In addition, the danger of any unfair prejudice caused by Dingey's testimony did not substantially outweigh its probative value. "For the evidence to be excluded on this basis, 'the probative value must be minimal and the prejudice great.' " *State v. Hardy*, 2017-Ohio-7635, ___ N.E.3d ___, ¶ 69 (2d Dist.), quoting *State v. Morales*, 32 Ohio St.3d 252, 257, 513 N.E.2d 267 (1987). In an effort to reduce any prejudice, the trial court prohibited Dingey from testifying about rude comments Dean made to his

grandmother during the prior encounter. The trial court limited Dingey's testimony to the fact that Dean was using profane language while he was in the Dollar General store a month prior to the incident in question. The evidentiary value of this testimony is significant given the fact that it is probative of an element of the aggravated menacing offense and of Dingey's positive identification of Dean. Finally, we note that any prejudice in admitting this testimony cannot be deemed great since the jury found Dean not guilty of the aggravated menacing charge for which the testimony was intended to prove.

{¶ 49} For the foregoing reasons, the trial court did not abuse its discretion in admitting evidence regarding the prior incident at Dollar General.

*Dean's Status as a Post-Release Control Supervisee*

{¶ 50} Dean next argues that the evidence presented at trial indicating he was on post-release control at the time of the offense in question was inadmissible other acts evidence under Evid.R. 404(B), thus rendering it unfairly prejudicial. We again disagree with Dean's claim.

{¶ 51} As with Dingey's testimony, the evidence indicating that Dean was on post-release control was not presented as proof of Dean's character. Rather, the State's purpose in presenting this evidence was to demonstrate why the police had authority to arrest Dean. As previously noted, Dean's post-release control supervisor, Chris Caughman, testified that after he was informed of the alleged threats Dean made at the Dollar General, he authorized Officer Molton to arrest Dean for violating the conditions of his post-release control. Caughman's testimony was relevant to prove that Dean

resisted a "lawful arrest" for purposes of establishing the resisting arrest charge. Without this information, the jury would not know why the police had authority to arrest Dean.

{¶ 52} The Supreme Court of Ohio reached a similar conclusion in *State v. Cowans*, 87 Ohio St.3d 68, 717 N.E.2d 298 (1999). In *Cowans*, the defendant's parole officer, Sandra Higgins, testified at trial regarding a search she conducted at the defendant's home that yielded various items of stolen property belonging to a murder victim. While testifying, Higgins informed the jury that she was the defendant's parole officer. The defendant argued that evidence of his status as a parolee should have been excluded under Evid.R. 404(B). In overruling this argument the Supreme Court stated that:

> We cannot agree. At no time during the guilt phase did the trial court, the parties, or any witness refer to the basis for Cowans's parolee status. The jury was informed only that Cowans was a parolee. The jury never learned that he had a prior murder conviction or even a felony conviction until the sentencing phase. In addition, the trial court instructed the jury not to consider Cowans's parolee status as character evidence.

> Moreover, Cowans's status as a parolee was relevant in the guilt phase, even though the nature of his previous crime was not. Higgins searched Cowans's house and found property that had been stolen from Mrs. Swart. Higgins was able to search Cowans's house because she was his parole officer. Without knowing her relationship to Cowans, the jury could not have understood why Higgins was searching Cowans's house. Cf. *State v. Allen* (1995), 73 Ohio St.3d 626, 632, 653 N.E.2d 675, 683.

Thus, Higgins's position as Cowans's parole officer was, as the trial court put it, "inextricably intertwined" with her testimony about the search. Accordingly, Cowans's fourth proposition is overruled.

*Cowans* at 78.

{¶ 53} Like in *Cowans*, the underlying conviction for which Dean was serving post-release control was never disclosed to the jury. None of the testimony nor the audio recording of Dean's encounter with police referenced Dean's prior conviction or the fact that Dean had been previously arrested. While the trial court did not specifically instruct the jury not to consider Dean's status as a post-release control supervisee as character evidence, the court did generally instruct the jury not to use evidence of other acts properly admissible under Evid.R. 404(B) as character evidence.

{¶ 54} Furthermore, after a thorough review of the record, we find that Dean's status as a post-release control supervisee was "inextricably intertwined" with the resisting arrest charge since that charge requires the State to prove that Dean resisted or interfered with a "lawful arrest." *See* R.C. 2921.33. Here, the State sought to prove that Dean resisted his arrest for violating the conditions of his post-release control. Therefore, the resisting arrest charge could not have been established without the jury knowing that Dean was on post-release control at the time of his arrest. Accordingly, any unfair prejudice caused by the jury knowing Dean was on post-release control did not substantially outweigh its probative value since Dean's status as a post-release control supervisee was necessary to establish the "lawful arrest" element of the resisting arrest charge. Furthermore, the likelihood of any resulting prejudice was minimal since the jury knew nothing about the previous conviction for which Dean was serving post-release

control.

**{¶ 55}** For the foregoing reasons, the trial court did not abuse its discretion in admitting evidence regarding Dean's post-release control.

**{¶ 56}** Having found no merit to the arguments Dean raised under Evid.R. 404(B), his Second Assignment of Error is overruled.

## Third Assignment of Error

**{¶ 57}** Dean's Third Assignment of Error is as follows:

THE TRIAL COURT ERRED IN FAILING TO MERGE APPELLANT'S CONVICTIONS FOR PURPOSES OF SENTENCING BECAUSE THEY WERE ALLIED OFFENSES OF SIMILAR IMPORT.

**{¶ 58}** Under his Third Assignment of Error, Dean contends that his convictions for assault, resisting arrest, and felonious assault are allied offenses of similar import that the trial court should have merged for purposes of sentencing.

**{¶ 59}** Ohio's allied offense statute, R.C. 2941.25, provides that:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such

offenses, and the defendant may be convicted of all of them.

{¶ 60} " '[W]hen determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.' " *State v. Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266, ¶ 12, quoting *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 31.

{¶ 61} As to the question of import and significance, "two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Ruff* at ¶ 23.

{¶ 62} In regards to animus, " '[w]here an individual's immediate motive involves the commission of one offense, but in the course of committing that crime he must, A priori, commit another, then he may well possess but a single animus, and in that event may be convicted of only one crime.' " *State v. Ramey*, 2015-Ohio-5389, 55 N.E.3d 542, ¶ 70 (2d Dist.), quoting *State v. Logan*, 60 Ohio St.2d 126, 131, 397 N.E.2d 1345 (1979).

{¶ 63} As previously noted, Dean was convicted of assault, resisting arrest, and felonious assault. Dean claims that these offenses should have been merged at sentencing because all of the actions underlying the offenses were perpetrated in furtherance of resisting arrest and thus committed with a single animus. However, contrary to Dean's claim otherwise, we find it clear that Dean's offenses were not

committed by a single act, but rather separate actions that resulted in separate, identifiable harm.

{¶ 64} In this case, Dean completed an assault against Officer Molton at the beginning of the encounter at Dean's residence when Dean spun around and punched Molton in the face as Molton was attempting to accompany him to the bathroom. Dean then committed the offense of resisting arrest when he fled to the bathroom, grabbed a hammer, and wielded the hammer above his head to prevent the officers from arresting him. Dean also failed to comply with Officer Molton and Sergeant Snyder's orders to drop the hammer and get on the ground. Thereafter, Dean committed felonious assault when he threw the hammer, a deadly weapon, at Molton, which struck him in the chest. Dean then continued to resist arrest by failing to follow Snyder's commands to put his hands up and by fleeing into the kitchen after being pepper sprayed.

{¶ 65} Although Officer Molton did not suffer any serious injuries from the incident, Dean nevertheless caused separate harm to Officer Molton by punching him in the face and striking him in the chest with a hammer. In addition, the arresting officer, Snyder, and the assaulted officer, Molton, are different individuals, and thus different victims. *See State v. Copeland*, 8th Dist. Cuyahoga No. 102952, 2016-Ohio-1537, ¶ 36 (holding that defendant's offenses of resisting arrest and assault were not allied offenses because the defendant committed the separate offense of assault when she kicked an officer in the face and also because the arresting officer and assaulted officer were two different individuals). For the foregoing reasons, Dean's offenses are not allied offenses subject to merger for sentencing.

{¶ 66} Dean's Third Assignment of Error is overruled.

**Fourth Assignment of Error**

{¶ 67} Dean's Fourth Assignment of Error is as follows:

THE TRIAL COURT ERRED IN IMPOSING FINANCIAL SANCTIONS AS

PART OF APPELLANT'S SENTENCE.

{¶ 68} Under his Fourth Assignment of Error, Dean contends that the trial court

impermissibly intertwined Dean's obligation to repay legal fees and expenses with his

assessment of fines and court costs. Dean also contends that the record does not

support the trial court's finding that Dean had the present and future ability to pay the

financial sanctions imposed by the trial court.

{¶ 69} As to the repayment of legal fees and expenses, we have held that

"although a defendant can indirectly be required to repay his court-appointed counsel fees

as a special condition of probation, he cannot be directly required to repay court-

appointed counsel fees as a criminally enforceable sanction and court-appointed counsel

fees may not be taxed as costs." *State v. Springs*, 2015-Ohio-5016, 53 N.E.3d 804, ¶ 9

(2d Dist.). Accordingly, the obligation to reimburse appointed-counsel fees cannot

properly be blended into a post-confinement repayment schedule. *Id.* at 12. Rather, if

the county desires to enforce reimbursement of legal fees and expenses, it is required to

pursue civil execution collection proceedings. (Citation omitted.) *Id.*; R.C. 2941.51(D).

{¶ 70} In his reply brief, Dean concedes that the trial court did not impose a post-

confinement payment plan for reimbursement of his legal fees and costs. Furthermore,

at the sentencing hearing and in the sentencing entry, the trial court specifically advised

Dean that his legal fees and expenses would be separately collected by the Clerk of Court

via a civil action and would not to be taxed as part of court costs. Accordingly, we find no error in the trial court's order for Dean to repay his legal fees and expenses.

{¶ 71} Dean's second argument challenges the financial sanctions imposed by the trial court on grounds that the court improperly found that Dean had the present and future ability to pay the sanctions. "R.C. 2929.19(B)(5) imposes a duty on the trial court to 'consider the offender's present and future ability to pay' before imposing any financial sanctions under R.C. 2929.18." (Citation omitted.) *State v. Philbeck*, 2d Dist. Montgomery Nos. 26466, 26467, 2015-Ohio-3375, ¶ 27. "[T]he statute establishes no particular factors for the court to take into consideration, nor is a hearing necessary before making this determination." (Citation omitted.) *Id.* "The record should, however, contain 'evidence that the trial court considered the offender's present and future ability to pay before imposing the sanction of restitution.' " *State v. Culver*, 160 Ohio App.3d 172, 2005-Ohio-1359, 826 N.E.2d 367, ¶ 57 (2d Dist.), quoting *State v. Robinson*, 3d Dist. Hancock No. 5-04-12, 2004-Ohio-5346, ¶ 17.

{¶ 72} In reviewing a trial court's imposition of costs and financial sanctions as part of a felony sentence, we apply the standard set forth in R.C. 2953.08(G)(2)(b), inquiring whether the imposition of costs and financial sanctions is clearly and convincingly contrary to law. *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 1; *State v. Kelly*, 6th Dist. Wood No. WD-16-015, 2017-Ohio-674, ¶ 10; *State v. Becraft*, 2017-Ohio-1464, 89 N.E.3d 218, ¶ 17-18 (2d Dist.). "[A]n appellate court may vacate or modify any sentence that is not clearly and convincingly contrary to law only if the appellate court finds by clear and convincing evidence that the record does not support the sentence." *Marcum* at ¶ 23.

{¶ 73} In this case, the trial court sentenced Dean to pay an aggregate $7,000 fine and court costs for his felony offenses. Prior to imposing these financial sanctions, the trial court stated the following at Dean's sentencing hearing:

The Court has reviewed and considered the information contained in the presentence report related to your age, health, education, and employment history. As well [as] statements made here today of the Prosecutor, your attorney, and yourself in considering your present and future ability to pay your financial obligations before imposing such a financial sanction on you. The Court finds that based on what is presented up today that you are employable and in good health.

Sentencing Trans. (May 26, 2017), p. 42.

{¶ 74} When Dean objected to the financial sanctions and requested the court to waive the $7,000 fine, the trial court stated:

The Court considered your request. The Court denies the request. The Court, number one, finds that the Defendant is capable of employment. Number two, that the Defendant has held a number of jobs in the past. Number three, that the Defendant acknowledges being able to provide for his family. But was unwilling to tell the Court how he provided for his family. So that leads the Court to believe that he was lawfully employed because I don't think that the Defendant is meaning to suggest to the Court that he got his funding from illegal sources. Number four, the Defendant will have opportunity to perform work in the institution.

Id. at 48-49.

{¶ 75} The foregoing portions of the record clearly indicate that the trial court considered Dean's present and future ability to pay the financial sanctions imposed as required by R.C. 2929.19(B)(5). In addition, each of the individual fines imposed by the trial court are within the authorized statutory range set forth in R.C. 2929.18(A)(3)(a) and (d). Accordingly, there is no indication that the financial sanctions imposed by the trial court are contrary to law.

{¶ 76} We also do not find by clear and convincing evidence that the record does not support the financial sanctions imposed by the trial court. In sentencing Dean, the trial court reviewed two PSI reports prepared for Dean in Champaign County Case Nos. 2006-CR-176 and 2012-CR-349. The PSI report from case No. 2012-CR-349 indicates that prior to his 2006 imprisonment, Dean had been employed at ORBIS, American Pan, and Tru Tech. The same PSI report also indicates that Dean was employed for two weeks in July 2012 after he was released from prison, but was subsequently laid off. Both PSI reports reviewed by the trial court indicate that Dean is in good health with no financial obligations other than a $60 per month child support payment. The record of Dean's birthdate indicates he is currently 34 years old and will be approximately 60 years old at the expiration of his prison term.

{¶ 77} Based on Dean's age, health, and employment history, we find that there was sufficient information in the record for the trial court to find that Dean has the present and future ability to pay the $7,000 fine and court costs.

{¶ 78} Dean's Fourth Assignment of Error is overruled.

**Conclusion**

{¶ 79} Having overruled all assignments of error raised by Dean, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, J., concurs.

DONOVAN, J., concurring in part and dissenting in part:

{¶ 80} I disagree with the majority's resolution of the assessment of fines and costs against an indigent individual with no identifiable assets or income, no stable or recent work history, and who will serve more than a quarter century in prison. I am firmly convinced and would find by clear and convincing evidence that the record does not support a finding that Dean has the present and/or future ability to pay. Although the trial court considered ability to pay, the record does not support its findings.

{¶ 81} First, in sentencing Dean, the trial court considered two PSI reports prepared for Dean in Champaign County Case Nos. 2006-CR-176 and 2012-CR-349. In other words, the most recent information that the trial court relied upon was five years old and some of the information was eleven years old. While it is not necessarily unreasonable for a trial court to rely upon a PSI from a prior case, the PSI information before the trial court was stale and could not reasonably be relied upon to provide accurate information about Dean's health and financial circumstances, including any recent employment history and the amount, if any, of his child support arrearage.

{¶ 82} Nevertheless, even if the court has properly considered the stale information, the information in the PSIs does not support the trial court's findings.

{¶ 83} Prior PSIs from 2006 and 2012 reflect that Dean has an 8th or 9th grade education. As a 34-year-old with a sentence of 25 years and 11 months, he will not be

released from prison until he is almost 60 years old. The majority notes that he is in good health, but with only stale PSI information, this determination cannot be definitively made by the trial judge. In fact, decades of documented alcohol and drug abuse may reasonably support a contrary conclusion. The stale PSIs establish he does not even own a car and has been living with relatives, rather than buying or renting his own place. He has three children and a support obligation of $60.00 per month (his arrearage, if any, is unknown as there is no current PSI), which would clearly exceed any amount he could conceivably earn in prison on a monthly basis. That is, even if he qualifies for such employment while incarcerated.[1]

**{¶ 84}** The Ohio Supreme Court has been clear and unequivocal by recognizing the importance of a thorough and current evaluation of a criminal defendant's ability to pay fines and court costs in preserving due process and equal protection of the law. Absent an updated PSI, no accurate current evaluation can be made on this record.   In fact, the Ohio Supreme Court issued powerful guidance reaffirming this principle the day before this case was scheduled to be argued. It stated:

> Here in Ohio, I have spoken out unequivocally that courts are centers of justice not automatic teller machines whose purpose is to generate revenue for governments including themselves. * * *   Court cases are not business transactions. We do not buy and sell a commodity: we perform a public service. * * * [T]he courts' fundamental and unquestionable responsibility is

---

[1] Individuals in prison do not earn wages comparable to free persons in the work force. Prison Policy Initiative, "How Much Do Incarcerated People Earn In Each State?" (April 10, 2017), available at http.//bit.ly/@Ejssiy. Individuals who are able to work in Ohio prisons earn an average of $0.21 to $1.23 hourly. *Id.* Clearly this is poverty level.

to ensure that justice is done. We should not be expected to engage in practices designed to maximize revenue by taking advantage of our citizens or ignoring basic constitutional standards.

Letter of Chief Justice O'Connor to all state judges, January 29, 2018.

{¶ 85} Likewise, the U.S. Supreme Court "has long been sensitive to the treatment of indigents in our criminal justice system." *Bearden v. Georgia*, 461 U.S. 660, 664, 103 S.Ct. 2064, 76 L.Ed.2d 221 (1983). We should do no less. We should not ignore the practical reality that even if working while in custody, Dean cannot earn base pay of more than $24.00 monthly. Ohio Adm.Code 5120-3-08. Given basic hygiene and medical supplies, coupled with child support which should be a priority, the reality is we are taxing someone who is impoverished. Further, if there is some unrealistic expectation the $7000.00 fine plus costs will be collected when he is 60 and released from prison, collection poses a barrier to reentry for someone who lacks a steady work record and would not even qualify for Social Security. Notably, the following exchange which occurred between Dean and the court at sentencing cannot be ignored:

THE COURT:      * * * Mr. Dean, what is the last job you've had?

THE WITNESS:    I ain't had a job.

THE COURT:      I'm sorry?

THE WITNESS:    I ain't had no job.

THE COURT:      Why is that?

THE WITNESS:    Because I was filing for Social Security.

THE COURT:      Why?

THE WITNESS:    That is what I said. I was filing for Social Security.

THE COURT: You had been previously employed at Orbis, American Pan, and Trutec prior to your 2006 imprisonment.[2] You were also employed for two weeks in July of 2012 after you were released from prison and you were laid off. Do you remember that?

THE WITNESS: Yes. It's been a long time ago.

THE COURT: Okay. When you were released from prison in November of 2015, why didn't you obtain employment?

THE WITNESS: Everybody ain't got that option.[3] [4]

THE COURT: Did you make any efforts to work with your PRC officer to obtain employment?

THE WITNESS: I did everything I had to do.

THE COURT: Did you attend any job readiness programs through

---

[2] This history of some employment was notably 11 years prior to this disposition. No length of time for each employer nor hourly wage is noted. Furthermore, the PSIs do not reflect any vocational training. Thus, two weeks of employment due to layoff in the past five years (2012-2017) can hardly establish any present or future ability to pay thousands in fines. Significantly, the most current 2012 PSI notes "offender was not employed at the time of the instant offense. His only source of income was family and friends." The 2006 PSI under occupation indicates "NA" and monthly income, none.

[3] With over 70 million Americans possessing an arrest record or criminal conviction, many ex-offenders have found it difficult to obtain employment. Pinedo, *Let's Keep it Civil: An Evaluation of Civil Disabilities, A Call for Reform, and Recommendations to Reduce Recidivism,* 102 Cornell L.Rev. 513 (2017).

[4] Harvard sociologist Devah Pager and others have documented the particularly harmful effect of criminal records on employment outcomes noting that criminal records mark their owners in a negative job credential. *See* Devah Pager, *Marked: Race, Crime and Finding Work in an Era of Mass Incarceration* (2007); Devah Pager, *The Mark of a Criminal Record*, 108 Am.J.Soc. 937, 942 (2003).

> Department of Job and Family Services?
>
> THE WITNESS: Yeah, I took care of responsibilities.
>
> THE COURT: Did you contribute financially to your mother's home?
>
> THE WITNESS: I took care of responsibilities.

**{¶ 86}** The trial court concluded from this exchange that Dean is "capable of employment." This is not the standard – present and future ability to pay is. The record established that between 2006 and 2017, Dean was in prison for approximately 9 years. Not surprisingly Dean's words reflect the reality that ex-felons may be capable of employment but as far as "obtaining employment," as he attested, "Everybody ain't got that option." Dean no doubt created this impediment by his criminal conduct, but it evinces his lack of employability.

**{¶ 87}** Furthermore, the trial court's conclusion that Dean provides for his family and refuses to reveal how he is employed is simply not borne out by the record. When asked about contributing financially to his mother's home, Dean responded "I took care of responsibilities." There is no evidence a wife (girlfriend), if any, or his children were provided for by him, and in fact the 2012 PSI reflects his children are with their mother(s) at addresses other than Dean's. The trial court should not conjecture what "I took care of responsibilities" at his mother's house means. Conjecture may lead to the conclusion Dean mows the grass, does the laundry, or takes his mother on errands (as sadly this case illustrates by the trip to the Dollar Store with his grandmother that led to his arrest and indictment.)

**{¶ 88}** The court surmises that Dean was lawfully employed "because I don't think that the defendant is meaning to suggest to the Court that he got his funds from illegal

sources." The finding that Dean was lawfully employed at the time of the present incarceration is not supported by review of the entire record, which includes an affidavit of indigency for appointment of counsel which shows ZERO assets and no job. This affidavit had been accepted by the trial court. Dean was appointed counsel due to indigency and bond was not posted. I recognize that a finding of indigence for the purpose of appointing counsel does not shield the defendant from paying a fine but it is relevant! *State v. Lewis,* 2d Dist. Greene No. 2011-CA-75, 2012-Ohio-4858, ¶ 16. All the more so here where there is no current PSI to assess health, education, employment history, and financial condition. At the very least, the finding of an ability to pay must consider a minimum core level of economic viability for persons against whom such fines are assessed. (*See* McLean, *Livelihood, Ability to Pay, and the Original Meaning of the Excessive Fines Clause,* 40 Hastings Const. L.Q. 833, 901 (2013)). Here, the fact that Dean acknowledged he takes care of "responsibilities" without the trial court's meaningful consideration of basic sustenance and economic survival should not be presumed as intended to achieve a legitimate penological objective.

{¶ 89} Lastly, the trial court noted, as a basis for imposing a financial sanction, that "there have been indications through the media that other defendants have struck it rich." There is nothing in this record to suggest that Dean will be one of those defendants. Suffice it to say, an evaluation of a defendant's future ability to pay based on unsupported speculation and conjecture is contrary to the statutory mandate to consider whether a defendant is likely in the future to be able to pay a financial sanction and amounts to nothing more than an arbitrary and fanciful determination.

{¶ 90} Unquestionably fines play a role in sentencing, but we must be mindful of

both their purpose and impact on an indigent person whose serious crimes and recidivism warrant a lengthy prison term.

A fine also cannot serve to rehabilitate or reform, if rehabilitation is defined as an extensive modification of an individual's anti-social attitudes or correction of his aggressive or compulsive criminal behavior. Thus, if the offender appears to be in need of substantial therapy and reformative treatment, (or a long term of imprisonment) a fine would be an inappropriate disposition. * * * The threat of monetary deprivation has only a limited capacity to dissuade an offense, although the exact limits of its deterrence are impossible to establish. * * * Nevertheless, fines can be useful in dealing with serious offenses, if they are imposed in combination with other sanctions in circumstances which indicate that a monetary deprivation will furnish some independent deterrent or correctional force. In addition, a fine used alone can provide especially effective deterrence whenever the prime motivation for a crime is pecuniary; in such cases, the fine serves to deprive the offender of his gain, as well as to exact monetary punishment. If the fine is large enough to outweigh the possible monetary gain, the threat of it may discourage even serious crimes. As a rule, however, a fine is most efficacious where the offense is minor, the offender is rational, and monetary gain is at best a secondary motive.

*Fining the Indigent*, 71 Colum.L.Rev. 1281, 1285-88 (1971).

{¶ 91} Here the offenses are not minor, the offender is not rational, and he has a long history of alcohol, cocaine, and OxyContin abuse as borne out by the record.

Furthermore, none of his offenses suggest monetary gain as a primary or secondary motive.

{¶ 92} When punishment is harsher than deserved, justice has not been attained and an injustice has occurred. I am reminded of Portia's words in *The Merchant of Venice*:

The quality of mercy is not strained.

It droppeth as the gentle rain from heaven

Upon the place beneath. It is twice blest:

It blesseth him that gives and him that takes.

'Tis mightiest in the mightiest; it becomes

The throned monarch better than his crown.

His scepter shows the force of temporal power,

The attribute to awe and majesty

Wherein doth sit the dread and fear of kings;

But mercy is above this sceptered sway.

It is enthroned in the heart of kings;

It is an attribute to God himself;

And earthly power doth then show likest God's

When mercy seasons justice.

William Shakespeare, *The Merchant of Venice*, Act 4, Scene 1.

{¶ 93} As noted by Judge Stone in *In re Weinstein,* 518 So.2d 1370, 1376 (Fla.App.1988), "[A] soupçon of mercy does not dilute the elixir we call justice; it infuses it, if not with godliness, then at least with humanity. If we must err, let it be on the side of humaneness."

{¶ 94} In my view, the record is bereft of any evidence that Dean has the present or future ability to pay fines and costs. I would find by clear and convincing evidence that the imposition of $7000 in fines plus costs is unsupported by the record and contrary to law.


Copies mailed to:

Jane A. Napier
Krista Gieske
Hon. Nick A. Selvaggio